## Funken v. Funken's Ex'r et al.

(Decided Dec. 12, 1933.)

CHARLTON B. THOMPSON and ROBERT C. SIMMONS for appellant.

GEORGE J. HEROLD and MATT HEROLD for appellees.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

Thelma Funken, granddaughter of Nicholas Funken, contested the latter's will. At the conclusion of her evidence the court directed the jury to find the paper involved to be the last will and testament of Nicholas

Funken, and the appeal challenges the correctness of this ruling.

The facts are: Testator came to Bellevue, Ky., in 1876, and began work driving a dray at $7 a week. After years of hard work he acquired a coal yard from which he sold coal, sand, stone, lime, etc., and at the time of his death in November, 1930, he had acquired an estate of about $50,000. He had three sons, George, Fred, and Nicholas. George and Fred were married, while Nicholas remained a bachelor and lived with his father until the latter's death. He also had three daughters, Antoinette, Mary, and Annie. Annie and Antoinette were married, and Mary remained at home and kept house for her father. In 1926, testator lost his wife, and several months before his death his married daughter, Annie, came to live with him. The will in contest was executed on November 14, 1927, and was prepared by Mr. Herold, brought to the testator's home and there executed. Nicholas Funken went after one of the witnesses. George Funken died in his father's home on November 7th, one week before the execution of the will. After bequeathing certain legacies to charities and to his grandchildren, including the sum of $250 to his granddaughter, Thelma Funken, the only child of his deceased son, George Funken, he gave the balance of his estate to his five living children. Had he made an equal division of the estate, after deducting the specific legacies, Thelma would have received about $8,000.

According to the evidence George Funken was 49 years of age when he died in 1927, and had worked for his father practically all his life. For a while he received only $10 a week, but was getting $25 a week at the time of his death. At that time he was engaged in unloading and delivering coal for his father. His wife owned some property, which brought in a small income. George was a good worker, but at times was addicted to drink, to such an extent that his father cautioned George's wife not to make any beer for him, and thereafter she did not make any. The relations between Mrs. George Funken and Thelma on the one hand and the testator and his sons and daughters on the other appear to have been friendly, although Mrs. George Funken never visited the testator's home after the death of his wife in 1926. However, Thelma went there occasionally. The home of the testator was only about half a

block from Mrs. George Funken's home, and was reached by an alley which ran from Lafayette avenue, on which Mrs. George Funken lived. On Saturday morning, November 5, 1927, George complained of not feeling well, and at the suggestion of his wife said he would go and see the doctor, and when he came back he would go to bed. He left and did not come back. Thelma returned home for dinner about 6 o'clock, and, after being informed of her father's illness, went to the home of her aunt, and from there telephoned two hospitals to find out if her father was there. They did not find out that night where George was. They sat up until 11 o'clock and then went to bed. The next morning they went to church at half past 6. While there she saw Nicholas Funken, but they never spoke to each other. After returning home from church Mrs. Funken went to the home of a neighbor to inquire what she should do. The neighbor suggested that she should go over to Mr. Funken's which she did. She found the testator in the kitchen, and said, "Pa, I don't know what was the matter, George was not home." Annie said, "Why he is here." What thereafter occurred is described in the following language:

"A. And I said 'here, what is he doing here' she said 'he took sick yesterday and you are in no condition to nurse him, and I am his sister, and I am going to nurse him' and she said she had the doctor and the priest and I said 'you had a right smart nerve getting the priest and doctor without letting me know' and she held her hand out—

"Q. Where was George? A. In the room next to the kitchen. She said I wasn't to go in there but I went in anyhow.

"Q. You forced your way by her? A. Yes.

"Q. And George was in bed? A. Yes, George was in bed.

"Q. What did you do? A. I went in and said 'George what in the dickens is the matter with you' he said 'Ag, I took sick yesterday, and I will be home in a day or two.' He seemed to think he would be all right in a short time.

"Q. What happened then? A. Well, then we started to fuss. I thought it was terrible that they

kept my husband there and they thought it was all right, and they started to fuss with me, and grandpa was the only one that was nice to me.

"Q. He treated you nice on that occasion? A. Yes he did, and he hollered to the girls and said if they didn't quit fussing, he would run out of the house. Then Mamie told me 'to get out,' and kicked me out.

"Q. How do you mean she kicked you out?

A. She took her foot and kicked my leg, and I got out.

"Q. Did you ask at this visit who the doctor was that attended George? A. I did, and Annie told me 'it is none of your business, I am his sister, I called the doctor and that is all there is to it.'

"Q. Did they tell you who he was? A. No, they did not.

"Q. They didn't tell you on that occasion? A. No, sir."

Thereafter she returned to her home and Thelma was there. She did not realize at the time that George would die. Monday afternoon she got a note from her sister stating that Dr. Zwick was the doctor, and she and Thelma started to see him. On their way they met Minnie Siemer, who said that they should go over. When they reached the testator's home George was either dead or dying. When they realized that George was dead they both cried. She turned to Thelma and said, "Thelma, don't cry like that, you have got Mama." Thereupon Fred Funken got hold of Thelma, shook her and said, "Yes, and you had a damn good father." He shook her very hard. Annie said that George called all afternoon for Thelma. That night they brought George home. She and Thelma went over to the home of Mr. Douglas and spent the night. George's brothers and sisters came over between the time he was moved home and buried, and also the testator. Right after George died Mr. Funken said, "Aggie, you got no place to bury George," and she said, "No." "He said, if I wanted to I could bury George on their lot, but there would not be room for me and Thelma." After they got home they talked the matter over and thought it

would be better for the two of them to be buried together, and declined Mr. Funken's offer. Her brother helped her with the expenses of the funeral to the extent of $500, but they received no assistance from the testator or his family. There was further evidence by Mrs. Funken that on several occasions George quit temporarily working for his father, and that his father gave as a reason why George should come back "that George was not working for him, but was working for himself and family, and in the end it would be all divided equally and he would not get any of it, but George and the family would." The testator said "he would disinherit him if he would not work for him, and do what was right, and if he would stick with the old man, the old man would leave him his share." Testator told Herman Douglas that he intended to leave George two pieces of property next to the house occupied by George. He told Mrs. Mary Arnold that he had made a will, and that George would get the building that she was in and the one next to it. "That will be next to his house and will keep his property together." The testator told Willard Schmidt that at his death his children would get equal shares. He told Minnie Siemer that he would give to charity what he wanted to give, and to his crippled grandchild enough for an education, and divide the rest among his children. He also said to Miss Elizabeth Siemer, "Well if anything happens to me, I got it fixed, and each one gets his share, and George gets this," pointing to the property next to George's house. According to Fred Rolf, Mrs. George Funken's brother, he offered George a job with an increase in wages of from $5 to $7 a week, with Saturday afternoons off, several years before George's death, but George declined the offer. There was some evidence to the effect that the relations between testator and George's family were always friendly, that the testator came to George's house frequently, and so did his wife until her death in 1926; that the testator always treated Mrs. George Funken "very nice," and spoke of Thelma in high terms, and said she was a fine girl.

According to Thelma Funken, she was 22 years of age on February 6, 1932, and therefore 17 years and 9 months old at the time of her father's death. On the Saturday her father left home she was working at the

five and ten cents store and came home about 6:30 p. m., and her father was not there. About 9 o'clock that night she went up to her aunt's to tell her that her father was not at home. When she returned home it was after 12 o'clock. Sunday morning they went to church. Her Uncle Nick was there, and her mother was going to tell him that Dad was not at home when she said, "Don't do that, maybe Dad will be home by the time we get home, and don't worry him." They then went to the home of Mr. Douglas. Mr. Douglas told her mother to go over and see his people, and tell them her Dad was not at home. Her mother went to her grandfather's home and was gone about 15 minutes. Her mother was very nervous and upset on her return. She then found out where her father was. The first she knew that her father was seriously ill was on Monday. Her aunt informed them Monday afternoon what doctor they had for Dad, and said it was best for them to go up and see him that night. On the way they met Miss Siemer, who said, "For God's sake, hurry, your father is dying." On reaching her grandfather's house all kinds of argument took place, and "Grandpa was the only one that was nice to us." Her aunts told her mother that she was no kind of a decent woman. They wanted to keep her father there and bury him from his father's place, but her mother objected, saying that he had a place of his own and would be buried from his own home. Her relations with her grandfather were very friendly. When she graduated from the eighth grade he gave her a watch. Her grandfather said that her mother was a good housekeeper, and he always liked her. After her father's death she noticed a change in her grandfather's treatment of her. When she passed his home and he was sitting on the porch, and any of his children were around and she spoke to him, he would not answer. She never refused to speak to her grandfather at first, but when she noticed that he would not answer her she just naturally stopped speaking too. It was about a month after her father's death that her grandfather stopped speaking to her. She graduated at the high school in June, and since that time she had been working for her uncle, Mr. Rolf, for a period of about four years. After her father's death she did not go over to her grandfather's home. She did not go on account of the treatment she and her

mother had received after her father had died. She spoke to her grandfather on the street and bade him the time of day. When she went to see her aunt Saturday night she went straight up Fairfield avenue. At that time her grandfather was on good terms with them and so were the members of his family, and she lived within a stone's throw of them. She did not go to her grandfather's house because she thought that if her dad was there they would have sent for them. She never thought her dad was at her aunt's but went there because her aunt had a phone and to ask her what to do. She did not tell her grandpa and uncles and ask them what to do because she did not want to worry her grandpa as he was an old man. Her mother had been on good terms with her aunts, and when her mother was sick her aunts would come over and look after her. She learned that her father was at her grandfather's home on Sunday morning after her mother returned and told her how she had been treated. Her mother told her that her father was in bed sick, and the girls told her that he had a cold and they were going to take care of him. She returned from the school about 4 o'clock Monday afternoon. She did not know her dad was seriously ill. Had she known it she would have gone to see him. She also says that she did not go because her mother told her that they would go up and see the doctor after supper and find out what was wrong with Dad, and also on account of the treatment they gave her mother the day before. She went over to her aunt's to get her idea as to what they should do to find her dad. She thought he was hurt or killed. Her Uncle Fred, with whom she spent all Sunday, had a phone, but she did not use the phone to call up her grandfather's home to inquire how her father was. The reason was that she would not do it after the treatment they gave her mother. She did not call up Monday morning or go to the home of her grandfather. Sunday morning she asked her Aunt Frances to find out what doctor they had. Her aunt said, "Go home, and don't worry, Dad will come home and everything will be all right." They learned that Dr. Zwick was the physician Monday afternoon, but did not call him over the phone, but were going to see him that night. She quit speaking to her grandfather about a month after her dad died. She did not talk to him because he would not answer her. She noticed that her grandfather was

a pretty level-headed man, and had a pretty good mind. She never asked her grandfather what was the matter, and could not tell why she did not ask him. After her father's death she never went over to her grandfather's because his children were mean and nasty. The night of her father's death she was out in the hall with the undertaker, Dr. Zwick, and the priest. Her grandfather said nothing about ordering her from the house, but was very nice to them. After her father had been taken over to his home, her grandfather and the others came there. Her father had a cold two days before the Saturday, but was not seriously ill, was not in bed. She never sent any flowers to her grandfather when he died, nor any spiritual bouquet. She and her mother did not go to her grandfather's home at the time of his death, but did attend the funeral.

According to appellant she had noticed that her grandfather was a pretty level-headed man, had a pretty good mind, and before that did not know that he could be influenced in any way. Other witnesses for appellant testified that the testator had a pretty good mind and could remember things that occurred years ago, that he had a mind of his own, and when he made up his mind he always did what he wanted to do, that if he had his head set you could not change him, and that he was firm of character and a self-made man.

It is not claimed that the testator was of unsound mind, but the insistence is that there was sufficient evidence of undue influence to take the case to the jury. Briefly stated, the argument is that the testator had not been paying his son George a sufficient salary, and was therefore under a moral obligation to make provision either for him or for his family; that the will was unnatural in that it practically disinherited George's only daughter, and being contrary to the testator's declared intentions, and there being some evidence tending to show undue influence, the case is one calling for an explanation by contestees. Helm's Guardian v. Neathery, 226 Ky. 42, 10 S. W. (2d) 474.

The other side of the picture was not presented, and contestant's right to go to the jury depends solely on the evidence which she introduced. In determining the question we start with two propositions: (1) The testator was a man of good mind and memory, and (2)

he was a self-willed man and not easily influenced. Not only is this shown by appellant's own witnesses, but there is not a suggestion in the record that the testator at any time ever yielded his views on any question to any of the contestees, or ever performed a single act that was not the result of his own will. There is no evidence that any of the contestees were present when the testator told his lawyer what to write, or that they made any suggestions as to the provisions of the will, or that they even knew in advance of the preparation of the will. It is admitted that up to the time of George's illness the relations between contestant and her mother and the testator and contestees were friendly, and that when contestant's mother was ill contestees visited and looked after her. We are not advised as to all that took place between George and his wife at the time he left home about 1 o'clock on the Saturday afternoon preceding his death. The evidence shows that he had had a cold, and that at Mrs. Funken's suggestion he left home for the purpose of visiting a physician and with the intention of going to bed on his return. As a matter of fact he did not go to see a physician, but for some reason went immediately to the testator's home. Though anxious about him, and fearful that some accident had befallen him, Mrs. Funken and contestant consulted others as to what they should do, but failed to consult the grandfather or his children, who lived only a few yards from their home. But, passing this feature of the case, we find that Mrs. Funken, at the suggestion of a neighbor, did go to the home of the testator on Sunday morning. It is at once apparent from her own testimony that, instead of being solicitous about her husband's condition, she precipitated a quarrel with contestees because her husband was in his own father's home, and as she claims without her knowledge, and then approached George, not with that gentleness and consideration due a husband that lay seriously ill, but with the remark, "George, what in the dickens is the matter with you?" It is not contended that the contestees were quarreling among themselves. The quarrel was with her, brought on by her own conduct and remarks. The testator was present and heard what was said, and threatened to leave the house unless the quarrel stopped. Clearly Mrs. Funken's conduct was calculated to excite some resentment on the part of those present. But laying this feature of the

case aside, let us take up the conduct of the contestant. For almost two days she knew that her father was so ill that he had taken refuge in her grandfather's house, but failed to go to see him, or even to telephone for the purpose of ascertaining his condition. Instead of being with her father, she and her mother were on their way to see the physician who treated him when informed that he was either dead or about to die. During all this time it was not necessary for the contestees to tell the testator what had taken place. He was present and knew all that occurred. He heard the quarrel between his daughters and Mrs. George Funken, and could not close his eyes to the way his son was treated by her. Not only so, but it was apparent to him that contestant had wholly neglected her father and had not displayed the slightest interest in his condition or recovery. Appellant's excuse is that she did not know how seriously ill her father was and did not care to go to the house because her mother had been mistreated. Even if this was a sufficient justification of her conduct in her own mind, she made no explanation to the testator, but left him under the impression that she cared nothing for her father. In view of the foregoing facts which were furnished by contestant herself, we fail to see wherein the testator was the victim of any undue influence, and even if it be conceded that the unequal provision made for contestant in the will, together with the attendant circumstances, calls for an explanation, that explanation is to be found in contestant's unfilial and unexplained conduct toward her own father, the son of the testator, which alone is sufficient to account for the fact that the testator did not give her the same portion of his estate that he would have given his son had he survived. It follows that the court did not err in directing the jury to return a verdict sustaining the will.

Judgment affirmed.